IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANGEL LUIS POYE,

        Plaintiff,              No. CIV S-10-3221 GGH P

    vs.

STATE OF CALIFORNIA, et al.,

        Defendants.       <u>ORDER</u>

_____/

        Plaintiff, a state prisoner proceeding pro se and in forma pauperis, seeks relief pursuant to 42 U.S.C. § 1983.  Plaintiff has consented to the jurisdiction of the undersigned. Docket # 7 (filed on December 20, 2010).  By order, filed on February 9, 2011, the complaint was dismissed with leave to amend.  Plaintiff has filed an amended complaint.

        As plaintiff has been previously informed, the court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1),(2).

        A claim is legally frivolous when it lacks an arguable basis either in law or in fact. <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989); <u>Franklin v. Murphy</u>, 745 F.2d 1221, 1227-28

(9th Cir. 1984). The court may, therefore, dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. Neitzke, 490 U.S. at 327. The critical inquiry is whether a constitutional claim, however inartfully pleaded, has an arguable legal and factual basis. See Jackson v. Arizona, 885 F.2d 639, 640 (9th Cir. 1989); Franklin, 745 F.2d at 1227.

A complaint must contain more than a "formulaic recitation of the elements of a cause of action;" it must contain factual allegations sufficient to "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). "The pleading must contain something more...than...a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Id., quoting 5 C. Wright & A. Miller, Federal Practice and Procedure 1216, pp. 235-235 (3d ed. 2004). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In reviewing a complaint under this standard, the court must accept as true the allegations of the complaint in question, Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740, 96 S.Ct. 1848 (1976), construe the pleading in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843 (1969).

In amending his complaint, plaintiff has made some effort to comply with the court's order. Although he filed an amended complaint which includes exhibits in a filing of 104 pages when he was directed not to exceed thirty pages in any amended complaint, plaintiff does keep the body of the complaint to thirty pages. Moreover, plaintiff at the outset has limited this action to twelve defendants, although at one point he undercuts this by stating that he has some

1   85 defendants. See Complaint, pp. 13-14.[1] Plaintiff does identify twelve defendants with one
2   additional defendant named in the body of the allegations who is not identified specifically under
3   "parties" as a defendant (Riley). The court will disregard plaintiff's anomalous reference to 85
4   defendants. In addition, plaintiff continues, as pointed out in the undersigned's earlier order, to
5   assert unrelated claims against different defendants, presenting something of a "mishmash" of
6   allegations. George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) ("[u]nrelated claims against
7   different defendants belong in different suits").

8               Although plaintiff has made an effort to simplify his claims, they are still not
9   altogether coherent. The gravamen of his amended complaint appears to be a purported equal
10  protection claim. Plaintiff begins by stating that on February 21, 2009, while working in the
11  prison dining hall, he became the victim of an unprovoked stabbing by a prisoner of similar
12  ethnicity, following which he was transported to the UC Davis Trauma Center for treatment.
13  Complaint, p. 14 & Exhibit (Ex.) A. On that day, his property was packaged and inventoried for
14  storage by correctional officers (C/O's) Jenkins and Williams, not parties to this action, to be
15  stored while plaintiff was in the ASU [administrative segregation unit]. Id. & Ex. B. The next
16  day, plaintiff was discharged from the hospital; during his absence, defendant Weaver had placed
17  plaintiff in segregation lockup pending further administrative review and possible action. Id. at
18  15 & Ex. C. After his discharge, defendant Mata inquired as to plaintiff's ethnicity and
19  affiliation during classification, to which plaintiff responded that he was classified as "other" and
20  had no affiliation "with any prison organization and hangs by himself." Id. & Ex. D. Plaintiff
21  alleges that the dining hall officer had correctly identified plaintiff as Hispanic. Id. Also on or
22  about Feb. 22, 2009, a 128C mental health form was generated indicating plaintiff had no current
23  psychiatric, emotional or mental health problems, thus clearing him for placement in

---

[1] Only the court's electronic pagination is referenced.

administrative segregation (Ad Seg).² Id. & Ex. E. On or about March 3, 2009, while plaintiff had a follow-up at UCD Medical Center, in his absence, defendants Dickinson, Mitchell, Hurtado and Siriley had a 128 G hearing and determined "plaintiff would remain in segregation pending an investigation into potential enemy safety concerns." Id. & Ex. F. Plaintiff notes that CAL. CODE REGS. tit.xv, § 3320(g) states an inmate shall be present at a disciplinary hearing. Id. (However, this appears to refer to misconduct reported on a CDC Form 115, i.e. a serious rules violations report/hearing, while this was a 128 G committee action to retain plaintiff in ASU pending an investigation into enemy safety concerns which it was noted plaintiff could not attend due to his being treated in an outside hospital, and even in a prison disciplinary context, there are listed exceptions to an inmate's attendance). In addition, plaintiff contends, an inmate has the right to request an investigative employee under CAL. CODE REGS. tit.xv, § 3315(d), staff assistance under § 3318(b), and witnesses under § 3315(e). (Again each of these provisions appear to apply in the context of a 115 hearing, not applicable here).

Plaintiff alleges that defendants Dickinson, Mitchell, Hurtado and Riley,³ ICC Committee members, racially profiled and discriminated against him based on his skin complexion, assuming him to be associated with African Americans and ignoring his C-file assertion that plaintiff was classified as "other" in his affiliation. Complaint, p. 16 & Ex. G. (The exhibit plaintiff references is a copy of a response from defendant Dickinson, which inter alia, indicates that he is identified on his legal status summary and in the distributed data processing system as Cuban and not black). Plaintiff again contends that holding an ICC hearing in his absence without a waiver denied him his right to call a witness, etc. Id. However, the response at Ex. G indicates that at an ICC hearing on Oct. 7, 2009, plaintiff refused to participate

---

² It is unclear whether plaintiff is drawing a distinction between ASU and Ad Seg housing.

³ Although plaintiff did not identify Riley as a defendant when naming individual defendants earlier in the complaint, the court will infer that this was an unintended omission and construe him/her to be a named defendant.

4

1 or make a statement so that his case was reviewed in absentia noting an investigation which

2 indicated plaintiff had ongoing enemy concerns at California Medical Facility (CMF).  Id., Ex. G.

3 Plaintiff claims that his safety was put at risk by his being deliberately misclassified and by

4 defendants "inferencing [sic] to the interviewed prisoner(s) he had crossed racial lines."  Id. at

5 16.  Plaintiff states that classification and categorizing of prisoners is the custom and practice of

6 CDCR.  Id.

7 Plaintiff alleges that during an ICC hearing on or about March 3, 2009, defendant

8 Mata submitted an 128-B informational chrono indicated that he had interviewed several general

9 population inmates about plaintiff's safety and allegedly plaintiff was affiliated with black

10 inmates, specifically the informational chrono, signed by Mata, states:

> On February 21, 2009, Inmate Calderon (V-53896) and Poye (F-81865) were involved in a fight in Dining hall # 2.  As a result, Poye sustained a puncture wound in the upper chest area.
> I interviewed several inmates in the general population regarding Poye's safety, should he return to the mainline.  During the interviews, I discovered although Poye is listed as Cuban, he runs with the Blacks.  It was suggested by the inmate population that it would not be a good idea to have either of the inmates return to CMF's mainline as it may pose a bigger problem between the blacks and Southern Hispanic population.
>
> Although it is believed that the altercation stemmed from an argument, I would recommend both Calderon and Poye be transferred to another institution.

19 Complaint, p. 16 & Ex. H, p. 48.  Plaintiff faults defendant Mata for having failed to note the

20 number of inmates he interviewed, their ethnicity, how reliable they were, if they had personal

21 knowledge or were just passing along what they might have heard or if they had a grudge against

22 plaintiff or a motive to lie.  Id.  Moreover, plaintiff notes that the culinary sergeant, Saragoza, not

23 a party, documented that he did not observe any other inmates involved, which plaintiff contends

24 is contrary to any finding that tension was created between blacks and Hispanics by the incident.

25 Id. at 17, Ex. I.  Plaintiff alleges racial discrimination by defendant Mata.

26 \\\\

Plaintiff then goes on to detail other classification hearings wherein he was retained in Ad Seg based on misinformation as to his ethnicity and affiliation, complaining about the report contained in his C-file concluding that the investigation into the physical altercation in which plaintiff was involved would place plaintiff's safety in jeopardy on the CMF mainline; the document states that plaintiff was "stabbed with a pen" in an "unprovoked" attack that "crossed racial lines." Complaint, p. 17. & Exs. J & K, p. 54. Plaintiff complains that he was deprived of due process at an ICC hearing on or about March 10, 2009, because defendants Swarthout, Mitchell, Hurtado and Riley denied him a due process right to participate in his own hearing, and was not able to prove his affiliation with "others" and to dispel that the incident had any bearing on alleged tension between blacks and Hispanics, leaving him to be held in Ad Seg for irrelevant reasons. Complaint, p. 18. At the March 15, 2009, 115 hearing on the incident of Feb. 21, 2009, plaintiff was identified as the victim, found not guilty and informed that the violation would be dismissed and plaintiff released in a couple of days. Id. at 19 & Ex. M, p. 58, copy of portion or RVR indicating plaintiff was found not guilty of fighting and charges were dismissed at March 15, 2009 hearing. Plaintiff filed a 602 grievance on March 31, 2009; the director's level review stated plaintiff had been released from Ad Seg from June 29, 2009 to August 14, 2009, but this was not accurate. Id. & Ex. N, copy of a portion of the September 25, 2009 director's level decision indicating that records showed plaintiff was out of ASU from June 29, 2009 and returned to ASU on August 14, 2009.

On April 23, 2009, defendant Hurtado distributed to plaintiff a CDC 114-D, showing plaintiff was being retained in ASU as a result of the investigation's conclusion that plaintiff might have enemy concerns on the CMF mainline and that he was to be retained there until an ICC meeting for possible transfer consideration, although plaintiff insists his retention in Ad Seg was based on misinformation as to his ethnicity and affiliation. Complaint, p. 19, & Ex. O, CDC 114-D. At an April 28, 2009, ICC committee review, it was again decided that plaintiff was to be detained in Ad Seg due to safety concerns and he was scheduled for transfer to

1  California Men's Colony (CMC). Id. at 20 & Ex. P, p. 64, ICC memo indicating it is still
2  unknown why the inmate attacked plaintiff but the investigation concluded plaintiff, a "Cuban
3  [who] associates with black inmates," might still be in jeopardy on the mainline, that although
4  plaintiff feels the altercation with Inmate Calderon was a work related dispute the ICC was not
5  convinced this was the only reason for the attack and that plaintiff should be retained in ASU
6  pending transfer.

7  Plaintiff alleges that he was suffering anxiety attacks, was interviewed on July 13,
8  2009, by an on-call psychologist and, when his mental health continued to deteriorate, plaintiff
9  was moved to mental health Ad Seg on or about August 14, 2009, it having been determined that
10 plaintiff met the Correctional Clinical Case Management System (CCCMS) criteria. Complaint,
11 pp. 20-21 & Exs. Q, R & S, pp. 68-73. Following his August 4, 2009, appearance before the
12 ICC when he was retained in ASU pending transfer, plaintiff was interviewed on Aug. 25, 2009
13 by an interdisciplinary treatment team (IDTT) of psychologists and diagnosed with major panic
14 disorder. Id. at 21 & Exs. U, pp. 77-79. Plaintiff appeared before the IDTT on Oct. 14, 2009,
15 wherein plaintiff was found not to be tolerating ADU well mentally and to have "hit rock
16 bottom," whereupon he was upgraded to Enhanced Outpatient Program (EOP) due to his
17 deteriorating mental condition. Id. at 22 & Ex. X, pp. 85-87. Plaintiff submitted a 602 grievance
18 regarding his deteriorating mental status. Id.

19 Plaintiff alleges that Hispanics are placed in the ASU at a grossly disproportionate
20 rate to their presence either in CMF general population or in California prisons generally.
21 Complaint, p. 27. This is a somewhat confusing claim inasmuch as plaintiff is also complaining
22 that he was kept off the mainline because he was wrongly classified as black. Plaintiff does
23 allege, however, that defendants have a policy of categorizing prisoners along racial lines which
24 jeopardized plaintiff as they had suggested he had crossed racial lines in his affiliation. Id.
25 Plaintiff alleges that he has repeatedly been classified as Hispanic by defendants with "other"
26 affiliation. Id. at 28 & Ex. G. Plaintiff alleges that he suffered cruel and unusual punishment

7

1  under the Eighth Amendment by his placement in ASU beyond the point at which he had been
2  found not guilty in a prison disciplinary hearing as evidenced by his deteriorating mental
3  condition, anxiety attacks, headaches, shortness of breath and insomnia. Complaint, p. 28. His
4  Fourteenth Amendment rights were violated by the racial discrimination/segregation to which he
5  was subjected. His due process rights were denied when he was deprived of his liberty and his
6  property without witness testimony, a staff investigator or presenting evidence. Id. Plaintiff
7  alleges that defendants' actions were willful, malicious and in reckless disregard of his rights
8  entitling him to punitive, as well as compensatory, damages. Id. at 30.

9  The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o
10 state shall . . . deny to any person within its jurisdiction the equal protection of the laws." See
11 Johnson v. California, 543 U.S. 499, 125 S. Ct. 1141 (2005) (under equal protection challenge,
12 state corrections department's unwritten policy of double-celling new/transferred inmates in
13 initial 60-day evaluation with cellmates of same race is subject to strict scrutiny standard of
14 review). Johnson did not determine whether the CDC policy at issue violated the Equal
15 Protection Clause, remanding for that determination, but did hold strict scrutiny to be the
16 applicable standard of review. Johnson, supra, at 515, 125 S. Ct. at 1152. To survive strict
17 scrutiny, defendants must demonstrate that any prison racial classification "policy is narrowly
18 tailored to serve a compelling state interest." Johnson, supra, at 509, 125 S. Ct. at 1148.
19 Plaintiff, by complaining of his placement and retention in Ad Seg based on what he believes
20 was a mischaracterization of his ethnicity and affiliations following an incident in which he was
21 stabbed by another inmate, does not implicate a prison racial classification policy where his
22 exhibits largely demonstrate that the retention was based on an investigation conducted by prison
23 officials, the results of which indicated plaintiff had enemy concerns and that his placement on
24 the prison mainline could place plaintiff, and others, safety in jeopardy. This claim must be
25 dismissed.
26 \\\\

Nor are plaintiff's rights to due process implicated by his being placed in administrative segregation. In general, prison officials' housing and classification decisions do not give rise to federal constitutional claims encompassed by the protection of liberty and property guaranteed by the Fifth and Fourteenth Amendments. See Board of Regents v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701 (1972). Nor does the Constitution guarantee a prisoner placement in a particular prison or protect an inmate against being transferred from one institution to another. Meachum v. Fano, 427 U.S. 215, 223-225, 96 S. Ct. 2532, 2538 (1976). See Rizzo v. Dawson, 778 F.2d 527, 530 (9th Cir.1985) (prison authorities may change a prisoner's "place of confinement even though the degree of confinement may be different and prison life may be more disagreeable in one institution than in another" without violating the prisoner's due process rights); Hanrahan v. Lane, 747 F.2d 1137, 1140-41 (7th Cir.1984) (allegation that prison guard planted false evidence in retaliation for prisoner's failure to pay extortion demand fails to state section 1983 claim so long as procedural due process was provided).

State regulations give rise to a liberty interest protected by the Due Process Clause of the federal constitution only if those regulations pertain to "freedom from restraint" that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300 (1995).

> [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. See also Board of Pardons v. Allen, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, e.g., Vitek v. Jones, 445 U.S. 480, 493, 100 S.Ct.1254, 1263-1264 (transfer to mental hospital), and Washington [v. Harper], 494 U.S. 210, 221- 222, 110 S.Ct. 1028, 1036-1037 (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Sandin v. Conner, supra. In this case, the threshold question is whether or not plaintiff's

1  retention in Ad Seg pending a transfer for the expressed reason that plaintiff's safety would be in
2  jeopardy were he to be placed in general population constitutes an atypical, significant hardship
3  in the context of ordinary prison life.  Although plaintiff complains of a deteriorating mental
4  health condition arising from what he believed to be a wrongful and extended placement in Ad
5  Seg, he has not sufficiently alleged that the conditions of his Ad Seg confinement subjected him
6  to atypical and significant hardships.

7          In Wilkinson v. Austin, 545 U.S. 209, 213, 125 S. Ct. 2384, 2389 (2005), the
8  Supreme Court found that conditions at an Ohio Supermax facility were more restrictive than any
9  other form of incarceration in the state, more restrictive even than the very restrictive form of
10 solitary confinement on Ohio's death row or prison administrative segregation units.  Detailing
11 the conditions of confinement at the Supermax prison, the court noted that inmates confined
12 therein "are deprived of almost any environmental or sensory stimuli and of almost all human
13 contact."  Wilkinson, at 214, 125 S. Ct. at 2389.  Applying the Sandin standard, the court found
14 that assignment to the Supermax facility with the attendant deprivations "imposes an atypical and
15 significant hardship under any plausible baseline."  Id., at 223, 125 S. Ct. at 2394.  Primary
16 among the considerations was the duration of confinement wherein all human contact was
17 prohibited; confinement at the Supermax was subject only to annual review and placement there
18 disqualified an inmate, otherwise eligible, for parole consideration.  Id., at 224, 125 S. Ct. at
19 2394-95.  Taking all the restrictive conditions together gives rise to a protected liberty interest,
20 thereafter requiring an analysis of what process was due.  Id.  In this case, however, plaintiff has
21 not met the threshold in the facts alleged of conditions giving rise to a protected liberty interest.
22 Plaintiff complains only of having been wrongly or unfairly confined, without specifying the
23 conditions of the confinement that might give rise to a liberty interest.  Absent that, plaintiff
24 cannot allege a due process violation because, without a liberty interest, plaintiff cannot show
25 entitlement to any due process in the context of this federal civil rights action.   This claim must
26 be dismissed.

Plaintiff also alleges, on a different topic, that on June 18, 2009, he submitted a 602 grievance regarding his missing property. Complaint, p. 20. Plaintiff details having been ordered to transpack his personal property on June 8, 2009 by defendant Jackson for a scheduled transfer to another facility. Id. at 23. Plaintiff later informed defendant Sheldon that he had an indefinite medical hold due to shoulder surgery he had on around June 2, 2009; defendant Sheldon threatened plaintiff with the loss of his personal property if he did not pack. Id. Plaintiff claims that defendants Sheldon and Jackson retaliated against plaintiff for his reluctance to transpack by confiscating plaintiff's approved items, which plaintiff lists, mostly food items, in addition to laundry detergent and a fan, property never replaced by CDCR. Id. at 24-25. When defendant Jackson released some of plaintiff's property on June 17, 2009, the items above which had not been properly inventoried were missing; because the missing items were not on the inventory sheet, defendant Swan refused to grant plaintiff's appeal; defendants Providence and Dickinson did not approve replacing the items. Id. at 25.

The United States Supreme Court has held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194 (1984); Taylor v. Knapp, 871 F.2d 803, 805 (9th Cir. 1989) ("[i]n Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908 (1981),[4] the Court held that where a deprivation of property resulted from the unpredictable negligent acts of state agents, the availability of an adequate state postdeprivation remedy satisfied the requirement of due process.") Thus, where the state provides a meaningful postdeprivation remedy, only authorized, intentional deprivations constitute actionable violations of the Due Process Clause. An authorized deprivation is one carried out pursuant to established state procedures, regulations, or statutes. Piatt v. McDougall,

---

[4] Overruled on another ground by Daniels v. Williams, 474 U.S. 327, 330-331, 106 S. Ct. 662, 664 (1986).

11

773 F.2d 1032, 1036 (9th Cir. 1985); see also Knudson v. City of Ellensburg, 832 F.2d 1142, 1149 (9th Cir. 1987).  The California Legislature has provided a remedy for tort claims against public officials in the California Government Code, §§ 900, et seq.  In the instant case, plaintiff has not alleged facts which suggest that the deprivation was authorized. T herefore, plaintiff's allegations of deprivation of personal property without due process do not state a cognizable claim for relief and will be dismissed.

        Plaintiff also complains about never having received a TENS unit (Transcutaneous Electrical Nerve Stimulation) prior to surgery on his shoulder although defendant Dr. Ditomas had recommended its use to relieve his chronic pain on or about March 6, 2009, and she failed to assist in determining the delay. Complaint, p. 26, Ex. 1f, p. 102, CDC-128 C chrono from defendant Ditomas re: the TENS unit.  Plaintiff submitted a 602 appeal on May 3, 2009 about the TENS unit.  Plaintiff underwent surgery on June 2, 2009 on his right shoulder still never having received the TENS unit and in severe pain.  Complaint, p. 26. Plaintiff could no longer tolerate the pain post-surgery, submitted another grievance and, on July 29, 2009, after nearly a five-month delay of unnecessary pain and suffering, plaintiff was able to retrieve his TENS unit. Id. at 27.  Plaintiff  alleges he was subjected to deliberate indifference to a serious medical need in violation of the Eighth Amendment when he was deprived of timely use of the TENS unit causing him significant pain and injury. Id. at 29.  The chrono at Ex 1f from defendant Ditomas states that plaintiff "suffers from chronic pain syndrome" which requires the use of the TENS unit and that the unit "is now part of his permanent personal property." Id. at 102.  The chrono, valid for one year from March 6, 2009, directs that the TENS unit should be sent with plaintiff to any other institution to which he is sent or sent with him when he paroles. What is not clear is that defendant Ditomas had any awareness that it was not in plaintiff's possession at the time; nor does plaintiff clarify that any inmate appeal regarding his lack of access to it was directed to her or that she had knowledge that he did not have such access.

\\\\

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Plaintiff has not sufficiently alleged how defendant Ditomas was deliberately indifferent to plaintiff's apparent need for his TENS unit to frame a colorable Eighth Amendment claim against her and he names no other defendant to whom his alleged prolonged delay in receiving the unit could be ascribed. Even if there were some defendant connected with the TENS unit allegation, the mere withholding of a TENS unit in the context of the present allegations simply does not rise to the level of an actionable Eight Amendment violation. This claim must be dismissed.

"Under Ninth Circuit case law, district courts are only required to grant leave to amend if a complaint can possibly be saved. Courts are not required to grant leave to amend if a

13

complaint lacks merit entirely." Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000). See also, Smith v. Pacific Properties and Development Corp., 358 F.3d 1097, 1106 (9th Cir. 2004), citing Doe v. United States, 58 F.3d 494, 497(9th Cir.1995) ("a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not be cured by the allegation of other facts."). "Liberality in granting a plaintiff leave to amend 'is subject to the qualification that the amendment not cause undue prejudice to the defendant, is not sought in bad faith, and is not futile.'" Thornton v. McClatchy Newspapers, Inc., 261 F.3d 789, 799 (9th Cir. 2001), quoting Bowles v. Reade, 198 F.3d 752, 757 (9th Cir.1999). "[A] district court retains its discretion over the terms of a dismissal for failure to state a claim, including whether to make the dismissal with or without leave to amend." Lopez v. Smith, 203 F.3d at 1124. "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." Metzler Inv. GMBH v. Corinthian Colleges, Inc. 540 F.3d 1049, 1072 (9th Cir. 2008), quoting In re Read-Rite Corp., 335 F.3d 843, 845 (9th Cir. 2003).

For the reasons set forth above, this court finds that plaintiff's amended complaint fails to state a claim and that further leave to amend would not cure its defects.

Accordingly, IT IS HEREBY ORDERED that this action be dismissed for plaintiff's failure to state a claim upon which relief may be granted.

DATED: June 9, 2011                    /s/ Gregory G. Hollows

                                       GREGORY G. HOLLOWS
                                       UNITED STATES MAGISTRATE JUDGE

GGH:009/poye3221.ord2